Nott, J.,
delivered the opinion of the court:
The outlines of this case are these:
In 1873, the Library Commission, under the Act 3 March, 1873 (17 Stat. L., p. 510, 513), by advertisement, invited plans for the Library of Congress and offered prizes. The claimants presented plans, were awarded the first prize, and paid the amount thereof, $1,500.
For the next thirteen years they spent nearly their entire time in preparing other and additional plans for the new National Library. The work was done at the request of, and in close consultation with the committees and commissions of Congress. It seems to have been' mutually understood that these committees and commissions, with one exception, had no authority to contract with the claimants or incur an obligation on the part of the Government, and the subject of compensation seems never to have been under consideration. Yet the work done by the claimants was immense, and the plans in response to repeated requests well-nigh endless. There were designs for Italian renaissance; for gothic; for improved gothic; for French renaissance ; for German renaissance; for Romanesque, and for revised Italian renaissance. There were designs for new interiors, and for changed dimensions, and for different materials.. More than one hundred finished plans were elaborated and delivered to the committees. The claimants also traveled through Europe and examined the great *496 libraries of the old world and brought back new ideas which were incorporated in new plans. Finally, on the part of the claimants, the most desirable elements of all the designs were incorporated into one, and on the part of the defendants, the general plans to carry it into effect were reported by the Joint Select Committee in 1881, and adopted by Congress in 1886.
In October, 1886, so soon as a plan was adopted and the erection of a building authorized, Hr. Smitlimeyer, the senior member of the claimants’ ñrm, was appointed architect, at a salary of $5,000 a year, and Mr. Pelz principal draughtsman, at a salary of $3,000. Mr. Smitlimeyer held his place as architect of the building only two years; Mr. Pelz is still employed by the defendants.
Besides the services which the claimants rendered from 1873 to 1886, they likewise furnished to the committees and commissions of Congress all the designs, plans, estimates, draughts-men, clerks, computers, and office room necessary and incidental to the work of an architect. It does nob definitely appear how much money they thus expended for the benefit of the Government, but it does appear that the expenses of an architect’s office are usually about 60 per cent, of the gross receipts, and, in confirmation thereof, that these expenditures in the office of the Supervising Architect of the Treasury are about 2-J per cent, of the cost of the buildings.
The demand which the claimants have accordingly presented by this suit is for a commission of 2J per cent. “ for preliminary studies, general drawings, and specifications,” as prescribed by the schedule of charges of the American Istitute of Architects, upon a building of the estimated cost of $7,000,-000. It appears by the evidence in the case that the executive branch of the Government has repeatedly employed architects who were compensated at the prescribed rates, and that at the present time the architect in charge of the new Naval Observatory is employed upon these terms. The claimants moreover rely upon the decision in Tilley v. County of Cook [103 U. S. R.) where the Supreme Court has said that if the architect’s plan had been used, evidence to show the usage would have been admissible, and has intimated that it would have been binding upon the county. In the District of Columbia v. Cluss (ibid, 705) the court also said that “ this was the ordinary rate of charge as compensation for similar services in the District.”
*497 At this point a question arises — much discussed in tbe course of tbe argument — as to 'tbe cost or estimated cost of tbe building, upon which tbe percentage of tbe architect must rest. The building is not yet erected, its cost is still more or less uncertain, and many years will necessarily elapse before tbe actual cost will furnish a basis for calculation. Tbe Institute’s schedule of charges is not confined to tbe actual cost of a building, but contemplates “proposed cost” estimated cost, and actual cost.
Ordinarily, when a person about to build goes to an architect, be states an amount within which he wishes the ultimate cost to be brought, and almost invariably states it at less than the building he has in mind can be erected for. When the builder’s estimates come in, they vary the proposed cost, and, in the experience of most men, enlarge it. As the work progresses, unforseen contingencies arise and unplanned improvements are suggested until the actual cost, as a general rule, exceeds the estimated. Accordingly, the schedule of charges provides that—
“ Until an actual estimate is received, the charges are based upon the proposed cost of the work, and the payments are received as installments of the entire fee, which is based upon the actual cost.”
In the case of this Government building there was no owner coming to the architect and stating the “proposed cost,” and asking for a plan that would not much exceed it. The act of 1886, which adopted the plan, fixed no limit to the cost. The act of 1888 limited the cost to $5,000,000, but abandoned the design of the claimants, and contemplated the erection of a different and cheaper building. The act of 1889 returned to the claimants’ plan, with an interior modification in the way of omissions, suggested by the Chief of Engineers, and limited the cost of the modified building to $6,500,000, including the two previous appropriations. The omitted portions of the interior are about one-sixth of the whole building, and the saving from the omitted parts is estimated at about $1,000,000. In the meanwhile an estimate on the claimants’ plan as modified by the Chief of Engineers, was made by that officer and submitted to Congress on the 1st of December, 1888, whereby he places the cost of the proposed modified building at $0,003,-140. It is therefore said that if the claimants are entitled to *498 recover at the rate which usage has established as the compensation of architects, the estimated cost of the building may be taken at $7,000,000, and their percentage will amount to $1.75,000, less the cost of preparing the specifications, which was $3,300.
We come now to the defense which the counsel for the G-ov-ernment has presented.
Although the claimants worked upon designs for the Library of Congress during a period of thirteen years, and produced at the request of different committees and commissions twelve distinct and original sets of plans, only one design was adopted, and for that one their counsel insist the defendants have paid nothing.
By the Act 8th June, 1880 (21 Stat. L., p. 165), the task of discovering a suitable design for the Library was assigned to what was termed in the act “ a joint select committee,” consisting of three members of each house, empowered “ to employ as soon as may be, at the expense of the United States, three persons of suitable skill and attainments ” to examine and consider the question of enlarging the Capitol and using it for the purposes of the Library.
The first section of the act is devoted to this idea of enlarging the Capitol, of improving it for legislative purposes, and of retaining the Library therein. The second section goes farther, and in express terms directs the Joint Select Committee “ at the same time to examine the question of a site outside the Capitol for the Library of Congress, and report to Congress what locations would be most suitable.” The third appropriated $5,000 “for the purposes named in this act.”
Three suitable persons were accordingly selected by the Joint Select Committee, one of whom was the senior member of the claimants’ firm. They reported adversely to using the Capitol for the purposes of a Library; but Mr. Smithmeyer, in addition to examining and reporting, also, at the request of the committee, framed an elaborate architectural design for the extension of the building, the incorporation of the Library therein, and the improved ventilation of the halls of Congress.
He did two other things at the request of the committee; he visited Europe for the purpose of studying the great public libraries there, and he produced plans for two distinct buildings on two different sites as contemplated by the second sec- *499 iion of the act. The plan for one of these sites, with forty elaborate drawings, embodying all of the improvements which had been made by the claimants since 1873, prepared by them .and bearing their firm-name of “Smithmeyer & Pelz, Architects,’7 was reported by the Joint Select Committee to Congress on the 14th January, 1881.
In 1884, while the adoption of the claimant’s plans was still a subject under consideration in Congress, Mr. Smithmeyer prepared an elaborate paper entitled “ Description of the Plans for a new Building for the Congressional Library,” which was laid before Congress and “ordered to be printed for the information of members of the House, April 3, 1884.” In this document, which was cited and quoted in subsequent debates in both houses, he estimated the cost of the proposed building to be erected according to those identical plans, at $5,586,200. This was the first and only estimate of cost that had been made when the act of 1886 was passed. It is true that when the estimate was made, the material of the building had not been determined, and that the estimate professes to be approximate;” it is true that the Chief of Engineers has since then estimated that the cost of the building to be constructed will amount to $6,003,140, and that Congress has authorized the erection of a building at the cost of $6,500,000; but nevertheless the fact remains that when the act of 1886 became a law, and when the construction of the building began, the claimant’s estimate was the only one that existed. The Chief of Engineers, indeed, estimated differently; but that was a transaction between principal and agent, between master and servant, occurring after the claimant’s right of action was complete. Congress, too, authorized the erection of a more costly edifice; but the estimate of the Chief of Engineers and the act of 1889 were inter partes ; the principal might overrule the estimate of the agent; the legislative power could repeal the act of 1889. The building is not yet erected, the actual cost is not yet determined, and the claimants’ case therefore comes bach to the fact that the only “pro'posed” or “estimated cost” of the building which existed when the plan was adopted aud the Government’s liability began, was an estimate which they themselves had made, and upon which Congress had acted, and that this estimate named the probable cost of $5,586,200. We must therefore conclude that if the claimants are entitled to recover *500 a commission of 2| per cent., the computation must be restricted to this estimate or proposed cost of $5,586,200, and can nob be made on the more probable but still uncertain cost of $7,000,000.
But it is not conceded that the defendants are liable for a commission on either of these amounts.
In dealing with this case it must be borne in mind always that there was no intrinsic property in the architect’s design. It was not covered by letters prtent; it was not protected by copyright. If an architect’s plans are lost or stolen it may be that á court of equity will enjoin a person not entitled to them from using them; but if he voluntarily makes an unrestricted surrender of them he loses all right or property in them; and when they are tendered to a party for inspection, then, by a usage so universal and self-apparent that it can not be questioned, it is mutually understood to be a tender of the services which produced the plans and are embodied in them. Accordingly in this case it must be held that when the claimants placed their plans before Congress their act meant a tender of the professional talent, skill, experience, study, effort, and labor which had produced the plans, and that the construction of a building according to their design would be in law, usage, and good conscience an acceptance of the service. The question therefore recurs upon what terms was this service to be paid for Í
Speaking for myself alone, I am of the opinion that compensation should be measured by the general rule and usage which govern the compensation of the profession. I think that in legal effect the claimants proffered their plans to Congress, through the intervention of the Joint Select Committee, for inspection, coupled nevertheless with the implied condition that if they were used, their services should be paid for, as like services are paid for by other persons; that when Congress adopted the design by the act of 1880, the case reached the condition of Tilley v. County of Cook (supra); and that when the defendants proceeded to give effect to the statute by actually using the plans in the erection of a building after their design, the case entered the third stage, in which, as the Supreme Court intimates, the legal liability of the employer at last becomes fixed, and the obligation to pay for the service becomes legally binding. Ithink, too, that the decisions of the Supreme *501 •Court holding that the usage of architects extends to and is binding upon a body-politic erecting a public building (Tilley v. County of Cook, supra), and that it has a recognized and established existence in the District of Columbia (District of Columbia v. Cluss, 103 U. S. R., 705), are authority for holding the usage obligatory upon the Government for a building erected in the city of Washington. The sum which would be recovered is large ($136,355), but the services embodied in these plans extended through the best part of these men’s professional lives, and the risk which they ran was immense. From October, 1874, when they began to give their whole time to Congressional committees and commissions, until Octobei’, 3886, when the work of construction actually began, no liability had fallen upon the defendants, and no remuneration had been given to the claimants, who had fought through these ■twelve years against the professional competition of the whole world. The undertaking was a game of chance in which they .staked their business lives; and they having won, the other party which had the benefit of the exemption and of the competition and which chose to do business in that way should not, in my judgment, grudge them the prize.
But the majority of the judges are of the opinion that the acts of the parties indicate that the services should be estimated according to the rule of quantum meruit, and not according to the schedule of charges of the Institute of Architects. According to that schedule the claimants would be entitled to 2-J per cent, up to the point where the suit brings their service, and to another 2£ per cent, if that service should continue until the completion of the building. Instead of the latter, the defendants elected to give and the claimants consented to take two annual salaries amounting to $8,000 a year as an equivalent for the percentage they would be entitled to according to the schedule. The claimants having thus “departed from the general rule of architects of measuring their compensation by the customary fees of their profession,” as is insisted by the counsel for the Government, and having done this with no express agreement or reservation as to the preceding part of their service, the court is of the opinion that that part should be estimated according to the same rule which the parties have themselves adopted. Takingthesefactsof mutual acquiescence as elements for computing damages, and bearing in mind that *502 a period of about six years existed between October, 1874, when the claimants began to give their entire time to what may be termed the evolution of these plans, and the 14th of January, 1881, when the plans were submitted to Congress (see Findings XI and XII), and remembering also that one of the claimants received from the Government for other professional services connected with a library during the same period the sum of $4,600, the court finds as the value of perfecting the design and preparing the plans a like equivalent of six years’ service at $8,000, and fixes the damages at $48,000.
The judgment of the court is that the claimants recover of the defendants the sum of ($48,000) forty-eight thousand dollars.